889 A.2d 1135 (2004)
382 N.J. Super. 552
Adelaida ORTIZ, Individually and as Administratrix of the Estate of Jasmine Fatima Abdul Rashid, Plaintiff,
v.
JOHN D. PITTENGER BUILDER, INC., Defendant
Maria Cruz, Plaintiff,
v.
John D. Pittenger Builder, Inc., Defendant.
Superior Court of New Jersey, Law Division, Monmouth County.
Decided December 15, 2004.
*1136 Anthony Malanga, Jr., Belleville, for plaintiff Ortiz (Gaccione, Pomaco & Malanga, attorneys).
David Levine, West Long Beach, for plaintiff Cruz (Chamlin, Rosen, Uliano & Witherington, attorneys).
Martin R. McGowan, Edison, for defendant (Methfessel & Werbel, attorneys).
LOCASCIO, J.S.C.
This motion for partial summary judgment, to dismiss plaintiffs' claims for negligent infliction of emotional distress, arises out of a January 31, 2001 house fire, which killed five-year-old Jasmine Rashid and seriously burned plaintiff Maria Cruz, Jasmine's maternal grandmother.
Plaintiffs contend that defendant landlord negligently maintained plaintiffs' Section 8[1] residence, which caused a fire to engulf the house, which burned Jasmine to death, and caused plaintiffs' emotional distress.
Defendant contends that plaintiffs' emotional distress claims should be dismissed because plaintiffs (1) did not actually observe Jasmine burning,[2] and (2) did not receive psychological treatment for emotional distress.
The issue of first impression is whether a bystander's emotional distress claim is actionable, where the bystander does not (1) observe the actual death of a relative, or (2) does not receive psychological treatment for emotional distress.
For the following reasons, this court concludes that a bystander's negligent infliction-of-emotional-distress claim is viable even without psychological counseling, and without actually seeing a relative ablaze, so long as the bystander is sensorially aware of the relative burning to death.

Facts
On January 31, 2001, plaintiff Adelaida Ortiz resided with her mother, plaintiff Maria Cruz, Ortiz's three children, and Ortiz's infant grandson, in an apartment *1137 owned by defendant, in Neptune Township, New Jersey. At approximately 3:00 a.m., Cruz awoke when she felt heat on her face. When Cruz saw the curtains in her bedroom on fire, she picked up her infant great-grandson and awoke her five-year-old granddaughter, Jasmine, who were both sleeping in Cruz's ground floor bedroom. Once Cruz made her way out of her bedroom, she saw the curtains in the living room on fire. As Cruz was carrying her great-grandson in her arms, and holding Jasmine by the hand, the windows exploded. The explosion startled Jasmine, who broke away from Cruz's grasp and disappeared into the smoke and flames. All during this horrifying experience Cruz was screaming "Fire!"
Cruz's warnings awoke Ortiz, who looked outside and saw flames at her second-story window. Ortiz wrapped herself in a blanket and ran to wake her son, James, and her daughter, Lakiesha, whose bedrooms were also on the second floor. Ortiz pounded on their bedroom doors until James and Lakiesha awoke. As Ortiz made her way down the stairs, she covered her mouth and nose with her blanket to avoid choking from the thick, black smoke that was billowing up the stairwell.
When Ortiz reached the kitchen, she met her mother who handed the infant to Ortiz while screaming, "Jasmine let go, Jasmine let go!" Cruz then ran back into the burning house searching for Jasmine. Once Ortiz brought her infant grandson to safety, outside the house, she heard her pregnant daughter Lakiesha screaming, from her second floor bedroom window, that she was trapped and could not get down the stairway. Ortiz yelled to her son James, who was on the second story balcony, to help his sister escape from the fire, which he did. James and Lakiesha climbed down from the balcony and met Ortiz in front of the house. After handing her grandson to Lakiesha, Ortiz immediately ran to a neighbor's house for help. When no one answered Ortiz's screams for help, she ran back to Cruz's bedroom window. Ortiz pounded frantically on the window, hoping to break the glass to create an escape route for her mother, who was still inside the inferno searching for Jasmine.
After several unsuccessful attempts to break the window, during which Ortiz cut her hand and sustained a bump on her forehead, she returned to the front of the house. Ortiz then witnessed her mother, on fire, running out of the house. As Ortiz patted out the flames on her mother, Cruz screamed hysterically, "I can't find her, I can't find her." Ortiz knew Cruz was referring to her daughter, Jasmine.
Although an ambulance transported Cruz, James and Lakiesha to the hospital, Ortiz remained at the scene hoping that rescuers would miraculously find Jasmine alive. When police arrived, Ortiz screamed that Jasmine was still inside the burning building. Ortiz remained at the scene until rescue workers ordered her to go to the hospital. The police then transported Ortiz to the hospital, where she reunited with her remaining family members. The fire did not burn Ortiz's two older children, James and Lakiesha, but it did burn the leg of her eight-month-old grandson. Ortiz saw her mother, who was badly burned and unconscious, before Cruz was airlifted to St. Barnabas Burn Center in Livingston, New Jersey, where she remained in a coma for six weeks. The day after the fire, Ortiz learned that Jasmine burned to death.
Ortiz received no treatment in the emergency room the night of the fire, though she did treat with her family practitioner, Dr. Susan Dick, following the fire. Ortiz sought treatment with Dick on three occasions, due to headaches she had been having since the fire. Dick prescribed sleeping pills, anti-depressants, and medications for *1138 Ortiz's headaches. Ortiz did not obtain psychological counseling because she had no time to care for herself, and even discontinued the depression pills, prescribed by Dick, because they were too strong to permit her to care for her mother and children. While Cruz was in a coma, Ortiz visited her daily.
Ortiz, and the surviving members of her family, were required to live with a friend for approximately five months following the fire. In February 2002, the family moved in with Ortiz's brother in Florida. Ortiz then went to work in order to pay for her mother's medication. Cruz does not qualify for Medicaid, and neither she nor Ortiz has health insurance.
Dr. Lawrence Eisenstein, a psychiatrist who examined Ortiz on May 27, 2004, noted, by history from Ortiz, that Ortiz cries everyday, isolates herself, locks herself in her room after returning home from work, has flashbacks and nightmares about the fire, has difficulty sleeping, gets chills when she is close to the location of the fire, and is reluctant to talk about the loss of her daughter Jasmine. Eisenstein noted that Ortiz was tearful and visibly upset when she discussed the fire with him in his office. Eisenstein opined, in his June 4, 2004 report, that as a direct result of the fire, Ortiz suffers from "Chronic Posttraumatic Stress Disorder with flashbacks, nightmares, obsessiveness about the situation, extreme depression, and isolation." Eisenstein also opined that Ortiz's "psychiatric problem is a direct result of the consequences of the fire as described and will continue to have a very significant emotional effect on Ms. Ortiz."
Dr. Wong, a neuro-psychiatrist who examined Cruz on June 6, 2004, noted, by history from Cruz, that Cruz feels "very depressed all the time ... feels sad and empty, ... [has] recurrent thoughts of death and recurrent suicidal ideas, ... [and] there is a feeling of detachment and estrangement from others." Cruz has recurring nightmares about the fire, during which she relives the experience. Cruz was reluctant to discuss the fire with Wong, and cried when she thought about everything she could have done differently to protect Jasmine. Cruz takes daily doses of Paxil, "an antidepressant and antianxiety medication, prescribed by her primary care physician following the fire." In addition, Cruz has extensive and significant cosmetic scarring over 40% of her body, which is a constant reminder of the tragedy. Wong, in his July 13, 2004 report, opined that Cruz suffers from "[p]ost-traumatic stress disorder, secondary to the accident and burns and having her granddaughter killed in the fire...." Wong also opined that these conditions were "causally related to the fire and permanent in nature."

Legal Analysis
In Portee v. Jaffee, 84 N.J. 88, 101, 417 A.2d 521 (1980), the Court promulgated the following four prongs that a bystander must satisfy in order to recover for negligent infliction of emotional distress:
1) the death or serious physical injury of another caused by defendant's negligence;
2) a marital or intimate, familial relationship between plaintiff and the injured person;
3) observation of the death or injury at the scene of the accident; and
4) resulting severe emotional distress.[3]
*1139 Defendant, for purposes of the instant motion, concedes that plaintiffs meet the first prong (Jasmine died as a result of defendant's alleged negligence) and the second prong (Jasmine was Ortiz's daughter and Cruz's granddaughter). In order to determine whether plaintiffs meet the third prong (observation) and the fourth prong (severe emotional distress), the court must first analyze Portee and its progeny.
New Jersey first addressed the issue of injuries caused by negligently induced fright over a century ago. In Ward v. West Jersey & S.R. Co., 65 N.J.L. 383, 47 A. 561 (Sup.Ct.1900), plaintiff alleged that:
[W]hile driving along a public highway at a point where it was crossed by the defendant's railroad, [plaintiff] was permitted, without warning from the defendant, to drive upon the crossing, in the face of an approaching train; that the gates by which the crossing was protected were raised when he drove upon it, but were carelessly and improperly lowered by the defendant's gatekeeper before he was able to pass entirely over, whereby he was subjected to great danger of being run down and killed by said train; and that, by reason of the danger to which he was thus exposed, he was shocked, paralyzed, and otherwise injured.
Because plaintiff was not actually struck by the train, the court held that, in the absence of contact, there could be no recovery for "the mere apprehension of personal injuries, which are not in fact received... when physical suffering follows as a consequence of the mental disturbance." Id. at 384, 47 A. 561.
Six years later, the court extended the Ward contact rule to permit fright injuries when there is any impact, however slight or inconsequential (a tap on the neck and dust in the eyes). Porter v. Delaware, L. & W.R. Co., 73 N.J.L. 405, 63 A. 860 (Sup.Ct.1906). Sixty years later, the court abandoned the Ward contact rule by permitting a fright recovery despite lack of physical impact. Falzone v. Busch, 45 N.J. 559, 214 A.2d 12 (1965). In Falzone, plaintiff, a passenger in a parked car, feared for her own safety when defendant's car veered across the highway in plaintiff's direction. In concluding "Ward should no longer be followed in New Jersey," the Court held:
[W]here negligence causes fright from a reasonable fear of immediate personal injury, which fright is adequately demonstrated to have resulted in substantial bodily injury or sickness, the injured person may recover if such bodily injury or sickness would be regarded as proper elements of damage had they occurred as a consequence of direct physical injury rather than fright.
[Id. at 569, 214 A.2d 12.]
The Court, in Falzone, imposed liability for the infliction of emotional distress when the defendant's negligence "created the potential, but not the occurrence, for physical harm to the traumatized individual." Portee, supra, 84 N.J. at 90, 417 A.2d 521 (emphasis added). The Portee Court extended that liability to a bystander who experiences "no potential for personal injury, but distress resulted from perceiving the negligently inflicted injuries of another." Ibid. (emphasis added).
In Portee, a seven-year-old boy was trapped, between the outer door and the wall of an elevator shaft, when the elevator proceeded up to the third floor, dragging the boy along with it. The police worked for over four hours, attempting to free the boy. Plaintiff, the boy's mother, watched "as her son moaned, cried out and flailed his arms. Much of the time she was restrained from touching him, apparently to prevent interference with the attempted rescue. The child suffered multiple bone fractures and massive internal hemorrhaging. *1140 He died while still trapped, his mother a helpless observer." Id. at 91, 417 A.2d 521. Plaintiff brought a wrongful death action against the owner of the building and the elevator companies responsibly for installing and maintaining the elevator, as well as an action on behalf of herself, "for her mental and emotional distress caused by observing her son's anguish and death." Id. at 92, 417 A.2d 521.
In considering whether to extend liability to a bystander in no potential danger but who observes a relative suffering, the Court first needed to determine whether the emotional distress was reasonably foreseeable. In doing so, the Court relied upon California's foreseeability criteria:
1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it.
2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence.
3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.
[Id. at 97, 417 A.2d 521(citing Dillon v. Legg, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912, 920 (1968) (emphasis added).]
In permitting the mother to recover for her mental and emotional distress, even though she had not experienced any risk of physical harm, the Portee Court astutely observed: "No loss is greater than the loss of a loved one, and no tragedy is more wrenching than the helpless apprehension of the death or serious injury of one whose very existence is a precious treasure." Id. at 97, 417 A.2d 521.

Observation
The third prong of Portee requires contemporaneous observation. Before plaintiffs can recover for negligent infliction of emotional distress, they must observe the death or serious bodily injury of a loved one at the scene of the incident. Id. at 101, 417 A.2d 521. The Court, in a later case, succinctly delineated the prerequisites of this prong:
Recovery for the negligent infliction of emotional distress is meant to cover the observation of shocking events that do not occur in the daily lives of most people. Merely being on the scene may not be enough. The injury must be one that is susceptible to immediate sensory perception, and the plaintiff must witness the victim when the injury is inflicted or immediately thereafter.
[Frame v. Kothari, 115 N.J. 638, 643-44, 560 A.2d 675 (1989) (internal citation omitted) (emphasis added).]
Courts outside New Jersey have extended the observation requirement to permit bystanders to recover for emotional distress, even if they do not witness with their own eyes, the actual injuries or death of a loved one. In Wilks v. Hom, 2 Cal. App.4th 1264, 3 Cal.Rptr.2d 803 (1992), an explosion, in plaintiff's home, killed one child, severely burned another, and propelled the mother out of the house. Although the plaintiff mother was aware that the explosion and fire likely harmed her two daughters, she did not visually witness the injuries being inflicted. The court concluded: "[I]t is not necessary that a plaintiff bystander actually have witnessed the infliction of injury to her child, provided that the plaintiff was at the scene of the accident and was sensorially aware, in some important way, of the accident and the necessarily inflicted injury to her child." Id. at 807 (emphasis added).
*1141 This court recognizes that fire cases are unique because "the flames are likely to hide the victims from the view of those present at the scene. To disallow recovery to plaintiffs in such cases merely because they did not actually view the injury being inflicted on the bodies of the victims defies reason and common sense." Stump v. Ashland, Inc., 201 W.Va. 541, 499 S.E.2d 41, 49 (1997) (emphasis added).
In Landreth v. Reed, 570 S.W.2d 486 (Tex.Civ.App.1978), two sisters, Melissa and Kecia, attended a day nursery. Kecia, fourteen months old, was found drowned in the pool. Although it was unclear whether Melissa saw Kecia in the pool, Melissa did see Kecia when rescuers brought Kecia to a room and attempted to resuscitate her. In upholding Melissa's claim for emotional distress, the court pointed out that "In the modern view, actual observance of the accident is not required if there is otherwise an experiential perception of it, as distinguished from a learning of it from others after its occurrence." Id. at 490 (emphasis added).
In In Re: Air Crash Disaster Near Cerritos, Cal., 967 F.2d 1421 (9th Cir. 1992), plaintiff left her husband and two children home while she went shopping. As plaintiff returned home, she heard a loud explosion. Upon approaching her home, she saw that a passenger airliner had crashed into her house, which was engulfed in flames. The court observed: "There could be very little doubt in Estrada's mind that her husband and children were in the house that she saw engulfed in flames." Id. at 1425. In upholding plaintiff's claim for her emotional distress, even though she did not see the actual plane crash or her family suffering, the court reasoned:
Estrada saw the fire consuming the home in which she had just left her family. The injury-producing event was the fire. Since Estrada was present at the scene of the fire, she was present at the scene of the injury-producing event.
. . . .
Estrada understandably experienced great emotional distress as a result of watching helplessly as flames engulfed her home and burned her family to death.
[Ibid.]
Similarly, in the instant matter, "there could be very little doubt in [plaintiffs'] mind[s] that [Jasmine was] in the house that [they] saw engulfed in flames." Ibid. Ortiz was aware of who was in the house when her mother's screams awakened her. Both times Cruz and Ortiz crossed paths during the tragedy, they spoke of Jasmine being inside the conflagration. Ortiz knew that Cruz, at one point, had Jasmine in her grasp, that Jasmine had broken free of her grandmother, whereupon Cruz raced back into the burning house to search for Jasmine. When Ortiz's mother reappeared from the burning house, Jasmine was not with her. Both Ortiz and Cruz were "sensorially aware, in some important way, of the [fire] and the necessarily inflicted injury to [their] child." Wilks, supra, 3 Cal. Rptr.2d at 807. Both Ortiz and Cruz observed "shocking events that do not occur in the daily lives of most people." Frame, supra, 115 N.J. at 644, 560 A.2d 675.
New Jersey cases have recognized that some unique fact patterns require the relaxation of Portee's contemporaneous observation requirement. In Carey v. Lovett, 132 N.J. 44, 622 A.2d 1279 (1993), a mother did not have to witness the death of her newborn, caused by a doctor's negligence, in order to establish a claim for negligent infliction of emotional distress. In Giardina v. Bennett, 111 N.J. 412, 419-20, 545 A.2d 139 (1988), the Court, in upholding the parents' claims for infliction of emotional distress, resulting from a doctor's malpractice, which caused a stillbirth, noted: "[T]he experience of pregnancy *1142 and child birth itself constitutes the immediacy and presence of the claimant in the face of inflicted personal injury or death of a loved one that was stressed in Portee."
For the foregoing reasons, this court adopts the "modern view [where] actual observation of the accident is not required if there is [as here] otherwise an experiential perception of it." Landreth, supra, 570 S.W.2d at 490. In doing so, this court follows the lead of the California courts and extends the Portee third prong of observation to include being "sensorially aware" of a family member who is within a burning building. Wilks, supra, 3 Cal. Rptr.2d at 807. Just as the plaintiff in Portee watched the elevator crush her son, Ortiz and Cruz watched the house engulf Jasmine in flames. The fire was "the injury-producing event," which plaintiffs observed. In re: Air Crash Disaster, supra, 967 F.2d at 1425. Whether or not plaintiffs actually saw the fire incinerating Jasmine does not prevent them from meeting the third prong of Portee. This court concludes that to deny plaintiffs the right to recover for emotional distress resulting from observing the fire burning Jasmine to death "merely because they did not actually view the injury being inflicted on [Jasmine] defies reason and common sense." Stump, supra, 499 S.E.2d at 49.

Severe Emotional Distress
The fourth prong of Portee requires a plaintiff to suffer severe emotional distress as a result of witnessing the injury or death of a family member. The Court specified what is necessary for a bystander to meet this prong:
The harm we have determined to be worthy of judicial redress is the trauma accompanying the observation of the death or serious physical injury of a loved one. While any harm to a spouse or a family member causes sorrow, we are here concerned with a more narrowly confined interest in mental and emotional stability. When confronted with accidental death, "the reaction to be expected of normal persons" is shock and fright. We hold that the observation of either death or this type of serious injury is necessary to permit recovery....
Therefore, a cause of action for emotional distress would require the perception of death or serious physical injury.
[Portee, supra, 84 N.J. at 100-101, 417 A.2d 521 (internal citation omitted) (emphasis added).]
Plaintiffs in the instant case, for three reasons, meet the severe emotional distress prong of Portee. First, this court has previously concluded that plaintiffs, who not only observed, but participated in, the injury-producing event (the fire), met the observation requirement of Portee. Because it is conceded that plaintiffs observed the fire that burned Jasmine to death, plaintiffs perceived Jasmine's death.
Second, according to plaintiffs' examining doctors, both plaintiffs suffered "shock and fright" as a result of observing the death-producing event. Ibid. Specifically, Eisenstein diagnosed Ortiz as suffering from "Chronic Posttraumatic Stress Disorder with flashbacks, nightmares, obsessiveness about the situation, extreme depression, and isolation ... (which) is a direct result of the consequences of the fire as described and will continue to have a very significant emotional effect on Ms. Ortiz."
Similarly, Wong found that Cruz was depressed and tearful, and had recurrent suicidal ideas and distressing nightmares about the fire. Wong diagnosed Cruz as suffering from "Post-traumatic stress disorder, secondary to the accident and burns and having her granddaughter killed in the fire ... [which are] causally related to the fire and permanent in nature."
Third, although the plaintiff in Portee "received extensive counseling and psychotherapy to help overcome the mental and *1143 emotional problems caused by her son's death," id. at 92, 417 A.2d 521, the Court, in the fourth prong, required only that a plaintiff sustain "severe emotional distress," id. at 101, 417 A.2d 521; it did not require extensive psychological treatment. In the instant matter, although plaintiffs had minimal treatment for their psychological injuries, each had some treatment. Cruz continues to take Paxil daily. Following this tragedy, although Ortiz, who has no health insurance, was too busy caring for her mother and children to care for herself, she did see her family doctor on three occasions. Her doctor prescribed depression medication, which Ortiz discontinued taking because it was too strong and interfered with her caretaker responsibilities.
Defendant's reliance upon Trisuzzi v. Tabatchnik, 285 N.J.Super. 15, 666 A.2d 543 (App.Div.1995) is misplaced. Defendant contends the Trisuzzi court disallowed plaintiff's emotional distress claim even though plaintiff, on five occasions, saw a psychologist, who diagnosed her as suffering from "a simple phobia of dogs running loose." Id. at 26, 666 A.2d 543. Here, neither plaintiff obtained any psychological counseling. However, the Trisuzzi court upheld the dismissal of the wife's claim not only because she failed to prove a severe emotional injury. The court disallowed the claim because she failed to
satisfy factors one and four of the Portee test. He [the trial judge] found that neither the physical injuries which Elaine watched her husband sustain nor her resulting emotional distress were serious enough to give rise to liability under Portee. We agree. Elaine saw the dog jump on her husband, bite him on his hands and bite at his groin. The injuries to his hands were not serious enough to disable her husband, who wrapped the wounds in his T-shirt and, with his wife and daughter, walked home from the incident. His most serious claimed injury, that to his penis, did not manifest itself until well after his encounter with the dog.
[Ibid.]
The incident observed by Trisuzzi, which "lasted about two to three minutes," pales in comparison to that observed by plaintiffs herein. Id. at 20, 666 A.2d 543. Additionally, Trisuzzi's psychologist "opined that had Elaine continued his recommended therapy, the phobia would have been resolved." Id. at 26, 666 A.2d 543. However, in the instant case, both plaintiffs' doctors, more than three years after the tragedy, found plaintiffs still suffering from the effects of observing the fire that burned Jasmine to death. Eisenstein opined that Ortiz's "psychiatric problem is a direct result of the consequences of the fire as described and will continue to have a very significant emotional effect on Ms. Ortiz." Wong opined that Cruz's post-traumatic headaches, and other injuries, were "causally related to the fire and permanent in nature."
This court concludes that plaintiffs' psychological injuries rise to the level of severe emotional distress as required by Portee. The added time, inconvenience and expense associated with securing psychological treatment is only one factor to consider in determining whether a plaintiff has met the fourth prong of Portee.
Another factor is the recognition that "[n]o loss is greater than the loss of a loved one, and no tragedy is more wrenching than the helpless apprehension of the death or serious injury of one whose very existence is a precious treasure." Portee, supra, 84 N.J. at 97, 417 A.2d 521. In this case, no tragedy could be more "wrenching" than the "helpless apprehension" that the conflagration plaintiffs observed was burning their little "treasure" to death. Ibid. As one court observed: "Our law would be cruel and less than adequate if it *1144 did not recognize the severe degree of emotional harm certain to be suffered by those who must watch helplessly while fire is causing injury or death to a loved one." Stump, supra, 499 S.E.2d at 50.
This court is neither "cruel" nor "less than adequate"; it recognizes "the severe degree of emotional harm certain to [have been] suffered" by plaintiffs in "helplessly" watching the fire burn Jasmine to death before their eyes. Ibid. Therefore this court holds that lack of psychological counseling and treatment is not fatal to plaintiffs' claims for negligent infliction of emotional distress.

Conclusion
This court concludes that, even without psychological counseling, and without actually seeing Jasmine ablaze, plaintiffs' negligent infliction of emotional distress claims are viable because plaintiffs sensorially experienced the burning death of their five-year-old relative. This court therefore denies defendant's motion for partial summary judgment.
NOTES
[1] 42 U.S.C.A. § 1437.
[2] Defendant concedes that plaintiff Ortiz actually observed her mother, plaintiff Cruz, ablaze.
[3] Plaintiffs concede that even though they sustained emotional injuries as a result of being in and escaping from the fire, which claims defendant is not seeking to dismiss, plaintiffs must meet the Portee prerequisites to recover for their emotional distress resulting from Jasmine's death and, as to plaintiff Ortiz, observing Cruz ablaze.